Justice THOMAS, dissenting.
Today the Court holds that an extortionist can conspire to commit extortion with the person whom he is extorting. See ante, at 1436. This holding further exposes the flaw in this Court's understanding of extortion. In my view, the Court started down the wrong path in Evans v. United States, 504 U.S. 255, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992), which wrongly equated extortion with bribery. In so holding, Evans made it seem plausible that an extortionist could conspire with his victim. Rather than embrace that view, I would not extend Evans ' errors further. Accordingly, I respectfully dissent.
I
The Hobbs Act makes it a crime to "obstruc[t], dela[y], or affec[t] commerce ... by ... extortion." 18 U.S.C. § 1951(a). The Act defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." § 1951(b)(2).
In Evans, this Court held that, to obtain a conviction for extortion "under color of official right," the Government need show only "that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." 504 U.S., at 268, 112 S.Ct. 1881. The Court therefore interpreted "extortion" under the Hobbs Act to be "the rough equivalent of ... 'taking a bribe.' " Id., at 260, 112 S.Ct. 1881.
I dissented in Evans because the Court's holding disregarded the "definite *1438 and well-established meaning" of the "under color of official right" element of extortion. Id., at 279, 112 S.Ct. 1881 (internal quotation marks omitted). " 'At common law it was essential that ... money or property be obtained under color of office, that is, under the pretense that the officer was entitled thereto by virtue of his office. The money or thing received must have been claimed or accepted in right of office, and the person paying must have yielded to official authority.' " Ibid. (quoting 3 R. Anderson, Wharton's Criminal Law and Procedure § 1393, pp. 790-791 (1957); emphasis deleted). When Congress enacted the Hobbs Act in 1946, "the offense was [thus] understood to involve not merely a wrongful taking by a public official, but a wrongful taking under a false pretense of official right." 504 U.S., at 281, 112 S.Ct. 1881 (emphasis deleted).
Given the established meaning of under-color-of-official-right extortion adopted in the Hobbs Act, the Court in Evans erred in equating common-law extortion with taking a bribe. Id., at 283, 112 S.Ct. 1881. Bribery and extortion are different crimes. Ibid. With extortion, "the public official is the sole wrongdoer." Ibid. Because the official "acts 'under color of office,' the law regards the payor as an innocent victim and not an accomplice." Ibid. An official who solicits or takes a bribe, by contrast, does not do so "under color of office"-that is, "under [a] pretense of official entitlement." Ibid. With bribery, "the payor knows the recipient official is not entitled to the payment," and "he, as well as the official, may be punished for the offense." Ibid. (emphasis deleted).
II
Relying on Evans ' definition of Hobbs Act extortion, see ante, at 1427 - 1428, 1434, the Court holds that an extortionist can conspire to commit extortion with the person whom he is extorting. Ante, at 1432 - 1433, 1436. That holding is irreconcilable with a correct understanding of Hobbs Act extortion and needlessly extends Evans ' error to the conspiracy context.
The general federal conspiracy statute makes it a crime for "two or more persons [to] conspire ... to commit any offense against the United States." 18 U.S.C. § 371. To be guilty of conspiracy to commit under-color-of-official-right extortion, then, two or more persons must conspire to "obtai [n] ... property from another, with his consent, induced ... under color of official right." § 1951(b)(2).
Under a correct understanding of Hobbs Act extortion, it is illogical and wrong to say that two people conspired to extort one of themselves. As explained, in a Hobbs Act extortion case, the only perpetrator is the public official; the payor is a victim and not a participant. See Evans, 504 U.S., at 283, 112 S.Ct. 1881 (THOMAS, J., dissenting). That understanding is irreconcilable with the view that an extortionist and his payor-victim can be co-conspirators to extortion of the payor. If a payor conspires with a public official for the payor to pay that official, then-whatever the two can be said to have done-they have not conspired to obtain payments to that official "under ... pretense of official entitlement." Ibid. The extortionist and payor both know that the official is not entitled to the payments as a matter of his office. They have not conspired to commit Hobbs Act extortion.
The record confirms that the scheme here did not involve extortion as the common law understood that crime. Far from victimizing repair-shop owners Alexis Moreno and Edwin Mejia, the allegedly extortionate scheme benefited them and their repair shop. Over time, 90% or more of the shop's business came from paid-for *1439 referrals from police officers. Moreno and Mejia worked with Ocasio and other officers to maximize the shop's profits from the scheme. Moreno and Mejia both pleaded guilty to Hobbs Act extortion and conspiracy-belying any claim that they were innocent victims. The Government itself does not maintain that the repair-shop owners paid Ocasio based on his assertion of "a false pretense of official right to the payment[s]." Id., at 282, 112 S.Ct. 1881 (THOMAS, J., dissenting). The Government is instead emphatic that Moreno and Mejia "participated as full partners" in the scheme and that "[t]he record ... refutes any suggestion that [they] were the 'victims' of th[e] scheme." Brief for United States 41. Whatever crime Ocasio may have committed, it was not a conspiracy to commit extortion.
To be sure, the Court's conclusion is plausible under Evans ' redefinition of extortion. But that is a reason not to extend Evans ' error. Only by blurring the distinction between bribery and extortion could Evans make it seem plausible that an extortionist and a victim can conspire to extort the victim. The Court today takes another step away from the common-law understanding of extortion that the Hobbs Act adopted.
III
The Court's decision is unfortunate because it expands federal criminal liability in a way that conflicts with principles of federalism. Even when Evans was decided nearly 25 years ago, the Hobbs Act had already "served as the engine for a stunning expansion of federal criminal jurisdiction into a field traditionally policed by state and local laws-acts of public corruption by state and local officials." 504 U.S., at 290, 112 S.Ct. 1881 (THOMAS, J., dissenting). By disregarding the distinction between extortion and bribery, Evans expanded the Hobbs Act to allow federal prosecutors to reach more conduct by state and local government officials. See id., at 291-294, 112 S.Ct. 1881. That expansion was unwarranted. Congress had not made its intent to regulate state officials "unmistakably clear in the language of the" Hobbs Act, Gregory v. Ashcroft, 501 U.S. 452, 460, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) (internal quotation marks omitted), so this Court had no basis for reading the Hobbs Act so expansively. Evans, supra, at 291-292, 112 S.Ct. 1881 (THOMAS, J., dissenting); see Jones v. United States, 529 U.S. 848, 858, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000) ("[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance in the prosecution of crimes" (internal quotation marks omitted)).
Today the Court again broadens the Hobbs Act's reach to enable federal prosecutors to punish for conspiracy all participants in a public-official bribery scheme. The invasion of state sovereign functions is again substantial. The Federal Government can now more expansively charge state and local officials. And it can now more easily obtain pleas or convictions from these officials: Because the Government can prosecute bribe-payors with sweeping conspiracy charges, it will be easier to induce those payors to plead out and testify against state and local officials. The Court thus further wrenches from States the presumptive control that they should have over their own officials' wrongdoing.
As in Evans, the Court cites no statutory text "clearly" authorizing this intrusion into matters presumptively left to the States. Jones, supra, at 858, 120 S.Ct. 1904. As in Evans, there is no need for the Court's overreach because state law already punishes the conduct at issue here.
*1440 See Md. Crim. Law Code Ann. § 9-201 (2012) (punishing bribery of and bribery by a public official); cf. United States v. Brock, 501 F.3d 762, 769 (C.A.6 2007) ("No one doubts that the States have criminal laws prohibiting their citizens from bribing public officials. [We cannot think of] any reason to doubt the States' willingness to invoke these laws when their citizens engage in [a brazen bribery scheme]"). And, as in Evans, the Court reaches its decision with barely a nod to the sovereignty interests that it tramples. See ante, at 1433 - 1434, and n. 9 (summarily dismissing as "unavailing" Ocasio's "invocation of ... principles of federalism"). As in Evans, I cannot agree.
* * *
Consistent with the Hobbs Act's text, I would hold that an extortionist cannot conspire to commit extortion with the person whom he is extorting. Accordingly, I would reverse the Court of Appeals' judgment upholding Ocasio's conspiracy conviction.
For these reasons, I respectfully dissent.
Justice SOTOMAYOR, with whom THE CHIEF JUSTICE joins, dissenting.
If a group of conspirators sets out to extort "another" person, we ordinarily think that they are proposing to extort money or property from a victim outside their group, not one of themselves. Their group is the conspiratorial entity and the victim is "another" person.
But in upholding the conspiracy conviction here, the Court interprets the phrase extorting property "from another" in the Hobbs Act contrary to that natural understanding. It holds that a group of conspirators can agree to obtain property "from another" in violation of the Act even if they agree only to transfer property among themselves.
That is not a natural or logical way to interpret the phrase "from another." I respectfully dissent.
I
The indictment here charged Ocasio, a former Baltimore police officer, with participating in a kickback scheme engineered by the owners of a local auto repair shop, brothers Herman Moreno and Edwin Mejia. Ocasio and other Baltimore officers referred car-accident victims to the brothers' shop for body repair work. In exchange, Moreno and Mejia paid Ocasio between $150 and $300 for each referral. The indictment pleaded that Ocasio, other officers, and the brothers conspired in violation of the federal conspiracy statute, 18 U.S.C. § 371, to commit extortion in violation of the Hobbs Act, § 1951.
The federal conspiracy statute applies whenever "two or more persons conspire" to commit a federal offense and at least one of them acts in furtherance of the offense. § 371. The Hobbs Act, a federal offense, punishes "[w]hoever" commits "extortion," § 1951(a), and defines "extortion" as "the obtaining of property from another, with his consent, ... under color of official right," § 1951(b)(2). "Extortion" includes taking a bribe. See Evans v. United States, 504 U.S. 255, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992).[1] Putting this all together, in charging Ocasio with conspiring to commit extortion, prosecutors charged him with agreeing to take bribes "from another" person. § 1951(b)(2).
At trial, rather than attempt to prove that Ocasio agreed with other officers to *1441 take bribes from Moreno and Mejia, the Government contended that when Ocasio agreed to take the brothers' bribes, he and the brothers agreed that Ocasio would obtain property "from another" person, i.e., someone other than himself. Ocasio argued, by contrast, that it is impossible for a group of people to agree to obtain property "from another" without evidence that "another" person outside the conspiratorial agreement gave up their property. Ocasio conceded that he alone could violate the Hobbs Act by taking a bribe from one of the brothers, but maintained that he and the brothers as a group could not also violate the conspiracy statute by agreeing that one of them would take a bribe from themselves. This Court now rejects Ocasio's interpretation.
II
The Hobbs Act criminalizes extortion where a public official obtains property "from another." § 1951(b)(2). The question here is how to define "another" in the context of a conspiracy to commit extortion. "Another" is a relational word. It describes how one entity is connected to a different entity. In particular, it describes an entity "different or distinct from the one first considered." Merriam-Webster's Collegiate Dictionary 51 (11th ed. 2003).[2]
In this case-a conspiracy to violate the Hobbs Act by obtaining property "from another"-the relevant entity to consider is the conspiratorial group. The federal generic conspiracy statute makes it a crime for two or more people to "conspire." § 371. This Court gives the word "conspire" its conventional meaning. See Salinas v. United States, 522 U.S. 52, 63, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997). To "conspire" is to agree, and the crux of a "conspiracy" is a "collective criminal agreement-[a] partnership in crime." Callanan v. United States, 364 U.S. 587, 593, 81 S.Ct. 321, 5 L.Ed.2d 312 (1961).
The most natural reading of "conspiring" to obtain property "from another," then, is a collective agreement to obtain property from an entity different or distinct from the conspiracy. But Ocasio, Moreno, and Mejia did not agree that Ocasio would obtain property from a person different or distinct from the conspirators as a group. They agreed only that Ocasio would take property from Moreno and Mejia-people who are part of rather than distinct from the conspiracy. "These three people did not agree, and could not have agreed, to obtain property from 'another' when no other person was involved." United States v. Brock, 501 F.3d 762, 767 (C.A.6 2007).
This understanding of "another"-that it refers to someone outside the conspiracy-is consistent not only with the plain meaning of the Hobbs Act, but also with this Court's precedent explaining that the purpose of conspiracy law is to target the conduct of group crimes. Conspiracy law punishes the "collective criminal agreement," because a "[c]ombination" or "[g]roup association for criminal purposes" is more dangerous than separate individuals acting alone. Callanan, 364 U.S., at 593, 81 S.Ct. 321. A conspiracy is "a partnership in crime," a "confederation," a *1442 "scheme," and an "enterprise." Pinkerton v. United States, 328 U.S. 640, 644, 646-647, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). Accordingly, the law treats a conspiracy, at least in some ways, as an entity distinct from its individual members.
A defendant is guilty of conspiracy only if he agrees that the conspiratorial group intends to commit all the elements of the criminal offense. Salinas, 522 U.S., at 65, 118 S.Ct. 469 ("A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense"). Because the focus is on the group's conduct-what "endeavor" they have agreed to commit collectively-when individual members of a conspiracy act to advance the conspiratorial endeavor, they act not on behalf of themselves, but as "agents for [the conspiracy's] performance." Hyde v. United States, 225 U.S. 347, 369, 32 S.Ct. 793, 56 L.Ed. 1114 (1912). It does not matter if a single member of the group undertakes to commit every element of the offense. Salinas, 522 U.S., at 63-64, 118 S.Ct. 469 ("The partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of each other"). When that one member acts as an agent for the conspiracy in furthering their collective endeavor, his actions are "attributable to the others," not just the individual agent alone. Pinkerton, 328 U.S., at 647, 66 S.Ct. 1180 ; see also id., at 646, 66 S.Ct. 1180 ("[S]o long as the partnership in crime continues, the partners act for each other in carrying it forward").
Accordingly, whether a criminal conspiracy exists depends on what the conspirators agreed to do as a group. This principle confirms that "from another" is best understood as relating the conspiratorial enterprise to another person outside the conspiracy. A conspiracy to obtain property "from another," then, is the group agreement that at least one member of the group will obtain property from someone who is not a part of their endeavor.
Departing from this natural reading of the text, the Court holds that Ocasio can be punished for conspiracy because Ocasio obtained property "from another" (Moreno and Mejia) and Ocasio, Moreno, and Mejia agreed that Ocasio would engage in that conduct. In order to reach this conclusion, the Court implicitly assumes that the Hobbs Act's use of "from another" takes as its reference point only a single member of the conspiracy, here, Ocasio, rather than the group of conspirators as a whole. See ante, at 1429.
But what is the basis for that assumption? The Court never explains. It is not based on the plain language of the Hobbs Act. A natural reading of the text seems to foreclose it-Moreno and Mejia are not "distinct or different from" the group that formed the "collective criminal agreement." And the Court's assumption does not follow from prior precedent or any first principles of conspiracy law. See Part III, infra .
Both the plain meaning of the statute and general principles of conspiracy law lead to the same conclusion: A conspiracy to commit extortion by obtaining property "from another" in violation of the Hobbs Act should exist only when the conspirators agree to obtain property from someone outside the conspiracy.
III
The Court does not ground its decision in the Hobbs Act's use of the language "from another." It instead relies on what it says are "age-old principles of conspiracy law." Ante, at 1427. But it does so to no avail. Most of these so-called principles are derived from decisions that turn on interpreting the text of another federal *1443 statute-the Mann Act. And the remaining generic principles the Court cites do not resolve the precise question in this case: whether the Hobbs Act's use of the phrase obtain property "from another" adopts the perspective of an individual conspirator or the conspiratorial group as a collective.
The Court's best support comes from cases interpreting the Mann Act, which made it a crime for "any person [to] knowingly transport ... in interstate or foreign commerce ... any woman or girl for the purpose of prostitution or debauchery." Ante, at 1430 - 1433 (quoting ch. 395, 36 Stat. 825) (emphasis deleted). In one of its decisions, this Court held that even though the transported "woman or girl" was ostensibly the victim of the crime, nothing in the statute precluded prosecutors from also convicting the woman for conspiring with another person to transport herself illegally. United States v. Holte, 236 U.S. 140, 144, 35 S.Ct. 271, 59 L.Ed. 504 (1915). From this, the Court derives a generic principle of conspiracy law that a victim of Hobbs Act extortion can also be liable as a co-conspirator, just like the victim of a Mann Act violation can. Ante, at 1431 - 1433.
The Court stretches this Mann Act case beyond its tethers. The Court in Holte based its analysis entirely on the text of the Act, not generic principles of conspiracy law. Unlike the Hobbs Act's use of "another person," the Mann Act prohibits transporting "any woman." Based on this language, the Court concluded that a woman could be held liable for conspiring with others to violate the Act. Holte, 236 U.S., at 144-45, 35 S.Ct. 271. For example, a "professional prostitute" could "suggest and carry out a journey" and "buy the railroad tickets." Id., at 145, 35 S.Ct. 271 ; see also 36 Stat. 825 (Mann Act) (specifying that "procuring or obtaining, any ticket or tickets" was assistance of a criminal sort). Thus, the Court held, "she would be within the letter of the act ..., and we see no reason why the act should not be held to apply." 236 U.S., at 145, 35 S.Ct. 271 (emphasis added).
Moreover, because Holte based its holding on the text of the relevant substantive offense, its reasoning is consistent with this Court's actual principles of conspiracy, which adopt the perspective of the conspiratorial group to determine if their agreed-upon conduct violated the text of the statute. If the members of an alleged Mann Act conspiracy agree to transport illegally "any woman," the group enterprise can logically and naturally intend to transport a female member of the group. But that logic does not hold in this case, where the Hobbs Act requires the conspirators to agree to obtain property "from another." "Any," unlike "another," is not a relational word that requires determining who is in the group and who is out.
The Court similarly attempts to create a generic conspiracy principle when it cites Gebardi v. United States, 287 U.S. 112, 53 S.Ct. 35, 77 L.Ed. 206 (1932), another Mann Act case that relies on the Act's text. In Gebardi, the Court considered the question whether a woman who merely acquiesced to being transported could be held liable for conspiring to violate the Act. The Court held that a conspiracy could exist only if the woman aided and assisted in her own transportation-something more than "mere agreement" or "mere acquiescence" to being transported. Id., at 119, 123, 53 S.Ct. 35. The Court based this decision explicitly on the language of the Mann Act, which "does not punish the woman for transporting herself.... For the woman to fall within the ban of the statute she must, at the least, 'aid or assist' someone else in transporting or in procuring transportation for herself." Id., at 118-119, 53 S.Ct. 35.
*1444 Accordingly, the Court reasoned, the "necessary implication" of Congress' decision not to include a woman who merely consents in the scope of the Act was "that when the Mann Act and the conspiracy statute came to be construed together, as they necessarily would be," Congress did not intend for that woman to nevertheless always be held liable as a conspirator. Id., at 123, 53 S.Ct. 35. This Court later characterized Gebardi 's holding as an "exceptio[n] of a limited character" to ordinary conspiracy law based on the "definition of the substantive offense," i.e., the text of the statute. Pinkerton, 328 U.S., at 643, 66 S.Ct. 1180. Whatever ordinary conspiracy principles might dictate, it was clear what Congress intended the outcome to be in that case.
The Court tries to elicit a general principle of conspiracy law from Gebardi : that while the ostensible victim of the statute-there a woman transported, here a person paying a bribe-cannot be convicted as a co-conspirator if she merely acquiesces to the transportation or bribe, an active participant in the conspiratorial group can nevertheless be found guilty of conspiracy. Ante, at 1435 - 1436. The Court draws this rough analogy in an attempt to cabin the scope of future Hobbs Act conspiracy charges to exclude potential defendants whose participation in extortion amounts to no more than "mere acquiescence." But this ignores the reasoning of Gebardi -the Court's reliance on the express terms of the Mann Act, not any generic conspiracy principles, led the Court to exclude a woman who "merely acquiesces" to being transported.
In addition to the Mann Act, the Court argues that its interpretation is correct because Mejia and Moreno can be held liable for conspiring to commit extortion even though they were incapable of committing the substantive crime themselves. (Because they are not public officials, Mejia and Moreno cannot obtain property "under color of official right." Ante, at 1429 - 1430.) True enough. But this principle does not lead to the conclusion that "from another" takes the perspective of Ocasio as its reference point, as opposed to the conspiratorial group.
For example, suppose a politician and a lobbyist conspire to have the lobbyist tell his clients to pay the politician bribes in exchange for official acts. The lobbyist cannot obtain those bribes under color of official right and so could not be charged with a substantive Hobbs Act extortion violation. But the conspiracy would still violate the Hobbs Act, see Evans, 504 U.S., at 268, 112 S.Ct. 1881 because the conspiratorial group obtained property "from another," i.e., from the clients who are outside the conspiracy that exists between the lobbyist and the politician. Now suppose the lobbyist instead agrees to pay the bribe himself. We would be back to the question at the heart of this case.
The Court's incapable-of-committing-the-substantive-offense principle therefore cannot do the work the Court thinks it does. It is entirely consistent to say obtaining property "from another" in violation of the Hobbs Act requires the conspirators to agree to obtain property from someone outside the conspiracy, and to say that every conspirator who enters into that agreement need not be capable of committing the substantive offense himself.
Finally, the Court raises policy concerns: It mentions that it would be odd to immunize the ostensible victims of a conspiracy to commit extortion-here, Mejia and Moreno-if they play just as active a role in the conspiracy as other members. Ante, at 1436.
While perhaps odd, that concern does not warrant the Court's contortion of conspiracy law where there are other criminal *1445 statutes-like federal antibribery laws and state laws-that reach similar conduct. See, e.g., 18 U.S.C. § 666 (criminalizing bribery of state, local, or tribal officials in specified circumstances); Md. Crim. Law Code Ann. § 9-201 (2012) (criminalizing bribery of public employee).[3] Of course, the Government could have attempted to convict Ocasio for conspiracy on these facts without relying on the Court's odd theory-for example, by proving that Ocasio conspired with other Baltimore police officers to extort property from the brothers.
And, in its effort to make sure Ocasio, Moreno, and Mejia get their just deserts, the Court's atextual interpretation of the Hobbs Act exposes innocent victims of extortion to charges that they "conspired" with their extorter whenever they agree to pay a bribe. The Court says not to worry, it will limit the scope of a conspiracy to exclude potential defendants whose participation in the extortion amounts to no more than "mere acquiescence," analogizing to Gebardi . Ante, at 1435 - 1436.
But Gebardi grounded its "mere acquiescence" standard in the text of the Mann Act. See supra, at 1444 - 1445. Here, without any textual hook in the Hobbs Act, the Court rests on no more than intuitions drawn from basic examples. If a restaurant owner threatened with closure by a health official reluctantly pays a bribe, the Court says that the owner is not guilty of conspiracy. Ante, at 1435 - 1436. According to the Court, he "consented" to extortion, but his mere acquiescence to an "official demand" did not create a conspiratorial agreement. Ibid . By contrast, the Court says, if a nightclub owner pursues a liquor license by asking his manager to bribe a public official, he is clearly guilty of conspiracy. Ante, at 1436. He agreed with the public official that the official would obtain property "from another," i.e., from him, in exchange for a license. Ibid.
These examples raise more questions than answers. When does mere "consent" tip over into conspiracy? Does it depend on whose idea it was? Whether the bribe was floated as an "official demand" or a suggestion? How happy the citizen is to pay off the public official? How much money is involved? Whether the citizen gained a benefit (a liquor license) or avoided a loss (closing the restaurant)? How many times the citizen paid the bribes? Whether he ever resisted paying or called the police? The Court does not say. It leaves it for federal prosecutors to answer those questions in the first instance, raising the specter of potentially charging everybody with conspiracy and seeing what sticks and who flips.
* * *
When three people agree to obtain property "from another," the everyday understanding of their agreement is that they intend to obtain property from someone outside of their conspiracy. The Court reaches the opposite conclusion, based entirely on an assumption that the Hobbs Act's use of "from another" takes as its reference point the vantage of Ocasio alone, rather than the group endeavor that constitutes conspiracy. The Court offers no explanation-grounded in either the text of the statute or so-called "age-old principles of conspiracy law"-for why that assumption is correct.
Conspiracy has long been criticized as vague and elastic, fitting whatever a prosecutor needs in a given case. See, e.g., *1446 Krulewitch v. United States, 336 U.S. 440, 445-457, 69 S.Ct. 716, 93 L.Ed. 790 (1949) (Jackson, J., concurring). This Court has warned that "we will view with disfavor attempts to broaden the already pervasive and wide-sweeping nets of conspiracy prosecutions." Grunewald v. United States, 353 U.S. 391, 404, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957). Today, in reaching an unnatural outcome predicated on an unsupported assumption, the Court says never mind.
I respectfully dissent.

Justice THOMAS sets forth why he believes Evans was wrongly decided. Ante, at 1437 (dissenting opinion). No party asks us to overrule Evans in this case and so that question is not considered here.

See also Oxford English Dictionary 348 (1st ed. 1933) ("One more, one further, originally a second of two things; subsequently extended to anything additional or remaining beyond those already considered; an additional" (emphasis deleted)); Oxford English Dictionary 495 (2d ed. 1989) (same); Webster's New International Dictionary 110 (2d ed. 1950) ("A different, distinct, or separate (one) from the one considered"); New Oxford American Dictionary 65 (3d ed. 2010) ("used to refer to a different person or thing from one already mentioned or known about"); American Heritage Dictionary 74 (4th ed. 2000) ("Distinctly different from the first").

Moreover, any oddity in the Hobbs Act's failure to punish the bribe payors for conspiring with the bribe takers may be partly explained by this Court's decision to hold that extortion under the Hobbs Act reaches a public official who accepts a bribe in the first place. See ante, at 1437 - 1438 (THOMAS, J., dissenting).